# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

CAROLINE B.[1],

                                                  Plaintiff,

      v.                                          3:17-CV-872 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                                Defendant.

---

PETER A. GORTON, ESQ., for Plaintiff
BENIL ABRAHAM, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed[2] an application for disability insurance benefits

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

("DIB") on March 24, 2014, alleging disability beginning November 10, 2013. (Administrative Transcript ("T") 226-27). Her application was denied initially on July 8, 2014. (T. 135). Administrative Law Judge ("ALJ") Robert F. Gale conducted a video-hearing on February 8, 2016, at which plaintiff and Vocational Expert ("VE") Linda N. Vause testified. (T. 77-118). In a decision dated June 7, 2016, the ALJ found that plaintiff was not disabled. (T. 25-39). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on July 26, 2017. (T. 1-6).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

At the time of the ALJ hearing, plaintiff was 46 years old and had completed the 12th grade in regular education classes. (T. 81, 84). Plaintiff also completed a BOCES course in cosmetology and a real estate course. (T. 84-85). Plaintiff testified that she could not perform either of those occupations because the cosmetology job required her to stand for long periods of time, and she could not keep the appointments that would

be required to perform a real estate job. (*Id.*)  Plaintiff testified that she also had computer skills, and she was familiar with WORD, but was "below a novice" with respect to some of the program's functions. (T. 83).  At one time, plaintiff worked in a job requiring data entry, but she could not remember the name of the employer. (T. 83-84).  However, plaintiff did remember that she lost the job because she had to leave work frequently because of the pain associated with her Reflex Sympathetic Dystrophy ("RSD"). (T. 84).

Plaintiff testified that her last job was working as a pharmacy technician at a CVS Pharmacy. (T. 85).  Plaintiff testified that at this job, she never had breaks, she was not allowed to sit, and she did not have a lunch break. (T. 85-86).  She testified that people "would take a bite while they were working." (T. 86).  Her RSD caused her to miss days, and when she was at work, her pain medication made it hard for her to think. (*Id.*)  Plaintiff testified that she worked there for three months, but was let go because she could not do the requisite amount of standing and could not keep up with the work. (*Id.*)

Plaintiff was married, but she was separated from her husband. (T. 82).  She lived alone in a single-family, ranch-style home. (T. 83).  Plaintiff's house was on one floor, but her laundry room was in the basement. (*Id.*)  Plaintiff stated that, if she had to do the laundry, she would slide down the stairs on "her butt" because of the RSD. (*Id.*)  Plaintiff had a valid drivers' licence with no restrictions, and she drove a car. (T. 81-82).  Plaintiff testified that, on a good day, if something went wrong with the car, she could take the bus. (T. 82).

Plaintiff testified that the "most significant medical condition" keeping her from working was the RSD. (T. 87). She testified that she was diagnosed with RSD in 2006, and that it got progressively worse over the years. (*Id.*) Plaintiff testified that she tried to work after she was diagnosed, but she estimated that she lost three jobs because of poor attendance, related to the pain. (*Id.*) Plaintiff stated that she had stabbing, burning, throbbing, numbing, or aching pain "at any given time." (T. 88). Occasionally, the pain was at a manageable level, but sometimes it would "drive [her] through the roof." (*Id.*) Plaintiff testified that the RSD was "diagnosed" in her left let, but that "it has gone to the right leg," and that "[it] can turn into a clubbed foot." Plaintiff also stated that there was a high suicide rate associated with RSD. (*Id.*)

Plaintiff stated that her second most significant condition was the depression that was caused by the RSD. (*Id.*) Plaintiff testified that her condition caused a lot of tension in her family, and they "just got tired of it." (T. 88-89). Plaintiff stated that she could not sit down, relax, and enjoy Christmas. The longest she was able to sit was 90 minutes "and that was many years ago." (*Id.*) Plaintiff testified that her third most significant condition was her "knees and feet." She stated that she had surgery to repair her ACL and MCL[3] on her left knee. Plaintiff also stated that she had "two additional surgeries" on her knees and had surgery on both feet. She had two surgeries on her right foot within eight months of the hearing. (*Id.*)

Plaintiff's fourth most significant condition was her kidney transplant. (*Id.*) She stated that she was in "Stage 2 of renal failure." Plaintiff stated that she had one kidney

---

[3] ACL stands for anterior cruciate ligament, and MCL stands for medial collateral ligament.

for 30 years, that she had been taking medication for it, and that it "had taken a toll" on her body. Plaintiff testified that the medication that she took for her kidneys made her more prone to skin cancer. (T. 90). In fact, she was diagnosed with skin cancer in 2010. She had surgery every year for skin cancer, first, for basal cell carcinoma, and then for basal and squamous cell skin cancer. (*Id.*)

Plaintiff stated that she had one year that was cancer-free, but that she got very depressed every time that the skin cancer came back because she could not undergo "traditional" treatments. She could not have chemotherapy or radiation because these treatments would cause her to reject her kidney, so she had to have surgery instead. (*Id.*) Plaintiff also testified that stress and her period make the RSD worse, so that when she finds out that the skin cancer is back, "it just sends [her] spiraling downward with more depression and the RSD." (T. 91).

Plaintiff testified that, on a typical day, she got up, took her pain medication, and went to lie down on the couch with her feet up. (*Id.*) Plaintiff testified that she did not eat very much, in part because she was not hungry, and in part, because of the pain. Generally, she did not cook, and she existed on yogurt, energy bars, and sometimes, food that she could cook in the microwave. (*Id.*) She first testified that she did some housework and went shopping. However, she then stated that she had some really bad weeks with the RSD, and the house did not look very good. In addition, she had not showered in three days because of the RSD and the depression, even though she tried. (T. 92). Plaintiff testified that when she went shopping, she often had to return to the store on another day because she could not complete her shopping in one trip. (*Id.*)

Plaintiff stated that she drove approximately ten or twenty miles per week, and usually, it was to and from doctors' appointments. (*Id.*)

Plaintiff had not attended church regularly for five years because the church was too far away. She could use buttons and a zipper, but it caused her pain, and she wore slip-on shoes because she could not bend down to tie shoes. (T. 93). Plaintiff also stated that due to carpal tunnel surgery that she had "within the last eight years, five years," writing and typing hurt her hands. (T. 94). She often massaged her hands because they ached and throbbed. Plaintiff estimated that she could lift and carry ten pounds. Plaintiff also estimated that, "on a good day," she could walk 15 or 20 minutes, but that on a bad day, she could only walk 5 minutes because of the RSD, but that it was "unpredictable." (*Id.*) Plaintiff testified that "on a good day," she could stand for 10 minutes, and she could sit for 10 or 15 minutes. (T. 95). The pain medication "can help, but nothing takes it away." (*Id.*) Plaintiff testified that she used to have hobbies, such as painting, but she could not do them any more because of her hands. (T. 96).

Plaintiff testified that she did not handle financial transactions well, and that she had her "services shut off" when she forgot to pay the bill because of her depression. (*Id.*) Plaintiff testified that she took Oxycontin and Hydrocodone, but that she did not take them the morning of the hearing because she had to drive, and the medications' side effects would affect her concentration so that she could not drive safely. (T. 97).

Plaintiff was also questioned by her attorney. (T. 96-108). Plaintiff discussed the consultative evaluation of July 2014, emphasizing that she was having a very good day,

"one of the best days [she] ever had," but that she was still in pain and trying to "hide it." (T. 98, 104-105). Plaintiff stated that there were some medications that she was unable to take for her other impairments because of the kidney transplant. (T. 100). Regarding her foot surgeries, plaintiff stated that the first surgery did not work as well as expected, so Dr. Nichols performed a second surgery a few months after the first. (T. 101-102). Plaintiff testified that, as a result of her foot impairments, she could not wear high heels or stand on her toes. (T. 102). Plaintiff stated that the doctor wanted her to wear compression hose, but that it hurt her "RSD." (*Id.*)

Plaintiff stated that she may have had a third surgery on her feet, but did not remember exactly when it took place. (T. 103). Plaintiff discussed her knee surgeries. (T. 103-104). She stated that each time she had surgery, the symptoms, caused by her RSD became worse. (T. 103). Plaintiff stated that, after her surgeries, the pain level was at "20," and that "it might come down to a 10, [but] it is always going to stay at a ten." (*Id.*) However, plaintiff did state that "a five to a seven is a good day." (T. 104).

Plaintiff's counsel also asked plaintiff about other jobs that she had attempted to perform after the RSD diagnosis. (T. 105-107). Plaintiff stated that she had a part-time job with the Town of Chenango, which she obtained because "the boss" was her neighbor. (T. 105). Plaintiff stated that, even though the job was part-time, sedentary, her employer knew about plaintiff's RSD, and she was allowed to keep a "cooler" under her desk so that she could put her feet up, she still could not do the job. (*Id.*) Plaintiff also worked in her attorney's office. (T. 106). Plaintiff testified that the job involved sitting, typing, and reading records, and she was allowed to work at home if

necessary. (*Id.*)  Plaintiff stated that, notwithstanding all the accommodations, she still could not do the work, and the attorney had to let her go. (T. 106-107).

The ALJ then took testimony from VE Vause. (T. 108-17).  The ALJ asked a hypothetical question incorporating an RFC for sedentary work, with several additional limitations, as stated below, including significantly greater limitations on the ability to sit, stand, and walk than appear in the definition of sedentary work. (T. 113).  The ALJ also incorporated mental limitations.  He stated that plaintiff could understand, learn new, and perform, simple tasks, could maintain appropriate concentration, and could maintain a regular schedule. (*Id.*)  The ALJ also stated that plaintiff could relate adequately to others as long as she was not in a supervisory or managerial position, but that she would be off-task 3-5% of the workday. (T. 113).  In response to the ALJ's hypothetical, the VE testified that there were three representative jobs that the plaintiff could perform, with all of the stated limitations: a charge account clerk, a document preparer, and an addresser. (T. 113-14).

Plaintiff's counsel questioned the VE about the ability to be on-task as well as unexcused absences. (T. 114-15).  The VE testified that her opinion was that employers would tolerate one unexcused absence per month, regardless of why the day was missed. (*Id.*)  The VE testified that it was her opinion that an employer would tolerate an employee being off-task up to 15% per day, whether the reason for being off-task was physical or mental. (T. 115).  In response to another question by counsel, the VE testified that a combination of absenteeism and being off-task could also affect an employee's job, even if each of them separately might not be sufficient. (T. 116).

The ALJ's decision provides a detailed statement of the medical and other evidence of record. (T. 25-39). There are a large number of medical records in the transcript. Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   THE ALJ'S DECISION

The ALJ began his decision by noting that plaintiff's insured status expired on March 31, 2015, thus, any disability must have commenced prior to that date. (T. 27). Plaintiff had not engaged in substantial gainful activity from her alleged onset date of November 10, 2013, through her date last insured. (*Id.*)  The ALJ found the following severe impairments: chronic renal failure; RSD of the lower left extremity; depressive disorder, and personality disorder. (*Id.*)  The ALJ also found various non-severe impairments, including a history of basal cell carcinoma; gastrointestinal reflux disease and dyspepsia; and mild gastritis. (T. 28).  The ALJ found that plaintiff also had "non-medically determinable impairments:" right elbow pain; occasional arrhythmias and hypertension with a past medical history positive for seizures; bunion deformity; and bilateral hammer toes. (*Id.*)

At step three of the sequential evaluation, the ALJ found that none of plaintiff's severe impairments, either alone, or in combination, met or medically equaled the severity of a Listed Impairment. (T. 29-31).  In making this determination, the ALJ considered Listing 1.02 (Major Dysfunction of a Joint) and 12.04 (affective disorder), and 12.08 (personality disorder). (*Id.*)  With respect to plaintiff's RSD, the ALJ found that there was no diagnostic evidence of the plaintiff's left lower extremity, showing

the pathology required for the listing. (T. 29).

The ALJ also reviewed the psychiatric "technique" reports, finding that plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and one "extreme" limitation and repeated episodes of decompensation, sufficient to satisfy the Listings. (T. 31). Finally the ALJ noted that the limitations identified in the "paragraph B" criteria were not an RFC and stated that the mental RFC assessment at steps 4 and 5 would require a more detailed assessment that he would cover later in his decision. (*Id.*)

At step four of the sequential evaluation, the ALJ found that plaintiff had the RFC to perform sedentary work with several additional limitations. (T. 31). Plaintiff could only lift and carry 10 pounds occasionally and less than 10 pounds frequently. She could stand for two hours in an eight-hour workday, but for no more than 30 minutes at a time. She could sit for six out of eight hours, but only for 45 minutes at a time. She could balance, stoop, and kneel occasionally, and she could operate foot controls with either foot. She could occasionally reach above chest level, but must avoid all unprotected heights and machinery with moving mechanical parts. (*Id.*) Finally, the ALJ found that plaintiff could maintain a schedule, relate to others, and would be off task about 3-5% of the workday. (T. 31). The ALJ engaged in a lengthy analysis of the medical evidence that he considered in making his decision. (T. 31-36).

Given this RFC, the ALJ found that plaintiff could not perform her past relevant work. (T. 37). Because of the additional restrictions, eroding the occupational base of sedentary work, the ALJ considered the testimony of VE Vause, who testified that,

based on plaintiff's age, education, previous work experience, and RFC, she retained the ability to perform jobs which exist in significant numbers in the national economy. (T. 37). The ALJ held that plaintiff was not disabled for purposes of the statute at any time from November 10, 2013 until March 31, 2015, the date that her insurance expired. (T. 38).

## V.   <u>ISSUES IN CONTENTION</u>

Plaintiff raises the following arguments:

1.     The ALJ erred in failing to find that plaintiff would be "off task" at least 15% of the workday and would be absent at least two days per month. (Pl.'s Br. at 8-14) (Dkt. No. 10)

2.     The ALJ improperly discounted plaintiff's psychiatric limitations. (Pl.'s Br. at 15-17).

3.     The ALJ failed to properly weigh Dr. Shah's "psychiatric medical opinions." (Pl.'s Br. at 17-24).

4.     The ALJ's Step Five determination was not supported by substantial evidence. (Pl.'s Br. at 24-25).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 4-19) (Dkt. No. 13). With the court's permission, plaintiff filed a reply brief. (Dkt. No. 16). For the following reasons, this court agrees with the defendant and will order dismissal of the complaint.

## VII.   <u>RFC and WEIGHT OF THE EVIDENCE</u>

### A.   **Legal Standards**

#### 1.   **RFC**

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.    Treating Physician

"Although the treating physician rule generally requires deference to the medical

opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran,* 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

The ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B.    Application

Plaintiff argues, inter alia, that she would be off-task and/or absent based on both physical and mental impairments.  The court has separated the two for purposes of its analysis, but understands that the arguments are based on the combination of impairments and has considered them in combination.

### 1.    Mental RFC

Plaintiff argues that the ALJ should have included "the undisputed" medical opinions which found that plaintiff would be off task at least 15% of the workday and absent at least two days per month. (Pl.'s Br. at 8-17).  In his reply brief, plaintiff's counsel has created a table, showing each medical provider who opined on this issue and their statements regarding these issues. (Pl.'s Reply at 1-2). The VE testified that if a worker were off task more that 15% and absent for more than one day per month, there were no jobs that the individual could perform. (T. 115-16). The ALJ found that plaintiff is able to maintain a schedule, relate to others, and she would only be off task about 3-5% of the workday. (T. 31).

On April 24, 2014, psychiatrist, Dr. Arun Shah, M.D. completed a questionnaire which asked about plaintiff's ability to be on task and about plaintiff's potential monthly absences from work. (T. 723).  Dr. Shah checked boxes indicating that plaintiff would be off task "Greater that 20% but less than 33%. (*Id.*)  He also checked a box indicating that plaintiff would be absent 3 or more days per month. (*Id.*)  The ALJ gave Dr. Shah's check box questionnaire "little evidentiary value." (T. 35).  At the time that Dr. Shah completed the form, he had only been treating plaintiff for approximately two

weeks.[4] (*Id.*)  The ALJ found that there were no contemporaneous treatment notes that would support this two-week assessment.  In fact, Dr. Shah's contemporaneous notes, dated the same day as the questionnaire state that plaintiff's memory and attention span were "good." (T. 929).  Dr. Shah specifically stated that plaintiff was "on meds," but there were "no side effects."[5] (*Id.*)

On May 8, 2014, Dr. Shah completed a form-report in which he stated that plaintiff complained of sweating, shakes, and forgetfulness due to her medications. (T. 737, 738).  However, Dr. Shah found plaintiff to be coherent, relevant, and cooperative, and her insight and judgment were good. (T. 738).  The doctor stated that plaintiff complained of poor memory, and that her attitude was "appropriate," but "negative," that she could be "well groomed to unkempt." (T. 739).  Dr. Shah also mentioned plaintiff's RSD and stated that plaintiff was not capable of "working," due to severe depression combined with RSD, multiple losses, stresses, and "no car." (T. 740).

However, May 8, 2014 report also states that, although plaintiff "c/o memory loss," she had "***no limitation***" on sustained concentration and persistence, social interaction, and adaptation, which includes the use of public transportation. (T. 741) (emphasis added).  This is inconsistent with his April 24, 2014 check-box form, where Dr. Shah checked boxes, stated that plaintiff would be "off task" for more than 20% but

---

[4] The questionnaire states that the time period covered by the doctor's responses was April 11, 2014 until April 24, 2014. (T. 723).

[5] The questionnaire states that side effects from plaintiff's medications were "dry mouth, tremors." (T. 723).  However, the court notes that the questionnaire asks what the side effects of the medications are, not whether plaintiff had the side effects.  Clearly, from the contemporaneous notes, plaintiff did not have those side effects. (T. 929).

less than 33% of the day, had a "medium" limitation in maintaining attention and concentration, completing a normal workday and work week without interruption from psychological based symptoms, and performing at a consistent pace. The May 8, 2014 opinion is also inconsistent with the April 24, 2014 finding of a "marked" limitation in performing activities within a schedule, maintaining regular attendance, and being punctual.

The record contains an unsigned check box document from Dr. Shah, dated January 28, 2016, and titled "Addendum to Questionnaire." (T. 1007). The form simply refers to the April 24, 2014 questionnaire and asks whether the plaintiff's condition has "improved," stayed "about the same," or whether it had "worsened." (*Id.*) The box indicating that the plaintiff's condition was "about the same" is checked, with no further explanation. (T. 1007). The ALJ gave this unsigned report "no evidentiary value." (T. 35). Plaintiff's counsel submitted a signed version of the form to the Appeals Council. (T. 11). Thus, the court will focus on the other reasons listed by the ALJ in giving the report no evidentiary value.[6]

The ALJ's determination regarding the limited weight given to Dr. Shah's April 2014 questionnaire and the doctor's May 8, 2014 conclusion regarding plaintiff's ability to "work," is supported by substantial evidence. The support for the ALJ's conclusion includes Dr. Shah's contemporaneous treatment notes, all indicating that, although plaintiff suffered from depression and personality disorder, her memory,

---

[6] The court need not determine whether the submission of the signed report to the Appeals Council should have been sufficient to send the matter back to the ALJ for further review because the ALJ based his decision on factors other than whether the report was signed by Dr. Shah.

attention span, and concentration were all "good." (T. 907-33).  Each report indicates that plaintiff was taking her prescribed medication and that she "denie[d] any side effects." (*Id.*)  There are fifteen separate reports, dated from April 24, 2014 until October 26, 2015.[7]  (*Id.*)  On March 17, 2015, Dr. Shah noted that plaintiff was taking her medications, and that there were no side effects. (T. 917).  Although plaintiff's mood was depressed, and she had "losses, stresses, conflicts, and accidents," her sleep, appetite, exercise, and pleasure were "fair," and her mood, thinking, behavior, and relationships were "fair." (*Id.*)  She was alert and oriented, coherent, relevant, and cooperative, with normal speech.  Her mood was depressed, but her affect was appropriate, and her attention span and concentration seemed "good." (*Id.*)

On May 8, 2014, Dr. Shah stated that plaintiff was not "capable of working," because of severe depression, combined with RSD, multiple losses and stresses, and the

---

[7] The ALJ also pointed out that the plaintiff's insurance expired in March of 2015, and that none of Dr. Shah's reports before that date would have established the limitations on plaintiff's concentration ("on task") or the number of unexcused absences estimated in Dr. Shah's April 24, 2014 form. (T. 36).  The reports dated after March 31, 2015 also do not support the limitations expressed in the form.  In fact, on October 26, 2015, plaintiff told Dr. Shah that she was "going out hiking in the Catskills" with a date, that she was taking her medications as prescribed, and that there were no side effects. (T. 907).  Although plaintiff's mood was depressed, her affect was appropriate, she was alert, coherent, and cooperative.  Her speech was of normal rate and volume, and her attention span and concentration seemed "good." (*Id.*)  There were no cognitive deficits noted, and her insight and judgment seemed "good." (*Id.*)  Dr. Shah's assessment was that plaintiff was "stable." The doctor's suggestion was for plaintiff to take good care of herself, eat healthy small, frequent meals, exercise, and get some fresh air and sunlight. (*Id.*)  The court does note that on September 25, 2015 - after her date last insured - Dr. Shah stated that plaintiff could not "work" due to her RSD and depression, and that she was fired "x3 due to that." (T. 909).  Whether plaintiff could "work" is a conclusion that must be left to the Commissioner, based upon the evidence in the record, together with a consideration of the relevant factors. *Rivera v. Berryhill*, No. 17-CV-991, 2018 WL 4328203, at *9 (S.D.N.Y. Sept. 11, 2018) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (a treating physician's statement that the claimant is disable or cannot work cannot, by itself, be determinative)).  In the same report, Dr. Shah made the same findings regarding plaintiff's attention and concentration.  Dr. Shah also added that plaintiff "still gets depressed, but not too deep." (T. 909).

19

fact that she did not have a car. (T. 740). However, the ALJ stated that Dr. Shah is a psychiatrist, and even though he opined that plaintiff's RSD made her depressed or worsened her depression, he was not qualified to determine what physical limitations resulted from the RSD.[8] In addition, whether plaintiff had a car was not a basis to find that she was unable to work. In the same report, Dr. Shah stated that although plaintiff "c/o memory loss," she had no limitation on "sustained concentration and persistence," social interaction, and adaptation. (T. 741). Dr. Shah's statement does show that he was attempting to consider all of plaintiff's impairments, and not that plaintiff's depression alone would render her incapable of "working." While Dr. Shah is not faulted for attempting to consider the entirety of plaintiff's problems, the ALJ's rejection of the conclusion that plaintiff could not "work," based upon Dr. Shah's statement is supported by substantial evidence.

Plaintiff argues that the ALJ did not analyze the opinion of Licenced Master Social Worker ("LMSW") Susan Major. LMSW Major opined that plaintiff would be off-task from 15-20% of the day and would have a "medium" or 20-30% limitation in her ability to maintain attention and concentration and complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Pl.'s Br. at 20-21). It is true that the ALJ did not specifically "analyze" LMSW Major's opinion.

---

[8] The report included a section in which Dr. Shah stated that because of her RSD, plaintiff could "not stand or sit for [sic] long time." (T. 740). Such a generalized statement would not be determinative of plaintiff's physical abilities. In any event, as stated above, the ALJ's RFC finding put substantial limits on plaintiff's sitting, standing, and walking.

However, in his opinion, the ALJ did mention that plaintiff "received treatment from Dr. Shah and counseling from Susan Major, but there is no objective evidence that the claimant would be unable to follow and understand simple directions and instructions and independently perform simple tasks." (T. 33). Clearly, the ALJ examined LMSW Major's report because he mentioned it in conjunction with an analysis of Dr. Shah's opinion. The ALJ is not required to reconcile "every shred" of medical testimony.[9] *Galiotti v. Astrue*, 266 F. App'x 66, 66 (2d Cir. 2008) (citation omitted).

In any event, the questionnaire completed by LMSW Major shows that it is another check-box form that makes conclusions without explaining a basis for these conclusions. (T. 718-19). Her accompanying progress notes do not support the conclusions that she makes in the questionnaire. Although the questionnaire indicates that LMSW Major had been treating plaintiff from June 14, 2012 until April 16, 2014, the notes that appear in the record begin on January 30, 2013 and end on April 16, 2014. (*Id.*)

In July of 2013, plaintiff told LMSW Majors that she had been "depression-free" for two months and feeling "generally at peace." Plaintiff also stated that her RSD was "in remission," and that she felt better with a cigarette, soda, and a pain pill. (T. 715).

---

[9] The court also notes that LMSW Major was not considered an "acceptable medical source" at the time of the ALJ's decision, although the ALJ does not mention this fact, thus the court assumes that the ALJ did not rely on this fact in failing to mention her opinion. With respect to claims filed before March 27, 2017, Social Security Ruling ("SSR") 06-3p made clear that only evidence from acceptable medical sources may establish the existence of an impairment. SSR 06-3p was rescinded, effective March 27, 2017. 82 Fed. Reg. 15263 (Mar. 27, 2017). However, the Federal Register notice provides that the rescission applies only to claims filed on or after March 27, 2017.

In August of 2013, the note simply stated that the "Depression ↑" and that plaintiff's expectations of others were unrealistic. (*Id.*) On October 7, 2013, LMSW Major wrote that plaintiff's RSD was "flaring up," and that her legs hurt because "she's worked 10 days straight [and] has been on her feet." (T. 716). The next note is dated five months later, states that "Depression ↑ since January," and that plaintiff had no job. (T. 717). There was some discussion about plaintiff's mother, and noted that plaintiff wanted to open her own business, but that she only wanted to work with positive people. (*Id.*) The last progress note in the record is dated April 16, 2014 and states that plaintiff saw Dr. Shah, but was not "completely honest with him." (*Id.*) Plaintiff commented on suicidal thoughts that she had, but told LMSW Major that plaintiff was "intuitive" and "blessed" and that she could never "do it." (*Id.*)

The above notes simply reflect conversations that plaintiff had with LMSW Major, and the ALJ's failure to either discuss the notes or specifically analyze LMSW Major's questionnaire is not error or cause for a remand. The ALJ fully explored Dr. Shah's reports and his questionnaire, finding that his opinion was not supported by the treatment notes. LMSW Majors's check-box form is more conclusory, and her notes contain less relevant information that Dr. Shah's reports. The ALJ's mention of LMSW Major in conjunction with Dr. Shah shows that the information was considered, even though it was not discussed, in determining that plaintiff could follow and understand simple directions and perform simple tasks. Therefore, the ALJ did not commit error in failing to discuss LMSW Major's opinions more fully.

The plaintiff also argues that the ALJ did not properly assess the consultative

psychological report written by Dr. Mary Ann Moore, Psy.D.. (Pl.'s Br. at 21-22). Plaintiff argues that the ALJ improperly failed to include Dr. Moore's opinion regarding plaintiff's moderate limitation in plaintiff's ability to deal with stress, relate adequately with others, make appropriate decisions, and maintain a regular schedule in the RFC determination. (*Id.* at 21). Plaintiff argues that the ALJ should have explained the "implicit rejection" of that part of Dr. Moore's opinion. (*Id.* at 21-22).

Plaintiff has neglected to mention that, as noted by the ALJ, in addition to the moderate limitation in dealing with stress, relating adequately with others, making appropriate decisions, and maintaining a regular schedule, Dr. Moore also found that plaintiff had "no" limitations in following and understanding simple directions and performing tasks independently. (T. 746). Dr. Moore also stated that plaintiff had only "mild" limitations with regard to maintaining attention and concentration, learning new tasks, and performing complex tasks independently. (*Id.*) The ALJ need not accept every part of a medical provider's assessment. *See Pellam v. Astrue*, 508 F. App'x 87, 89-90 (2d Cir. 2013).

The court would also point out that, in his contemporaneous progress notes, plaintiff's treating physician, Dr. Shah, never mentioned that plaintiff had any problems relating adequately with others or maintaining a schedule. While Dr. Shah did mention stress, he also noted that plaintiff was dealing with situations better and focused some of his therapy on stress management. In fact, most of Dr. Shah's contemporaneous progress notes indicate that plaintiff was "coherent, relevant, and cooperative, with good insight and judgment. (*See* T. 921, 923, 925, 926, 927, 928). On August 4, 2014,

Dr. Shah stated that plaintiff was "stable on medications and able to deal with situations better." (T. 923). On December 12, 2014, Dr. Shah noted that plaintiff's mood was stressed, but her affect appropriate, and plaintiff told him that her mood, thinking, behavior, and relationships were "all good." (T. 921). Dr. Shah stated that he discussed healthy, mature coping skills, stress management, and relaxation techniques with plaintiff. (T. 921). Dr. Shah stated that plaintiff was "better." (T. 921, 923, 925).

Plaintiff also argues that Dr. Moore found that plaintiff had only "fair hygiene," lethargic motor behavior, a monotonous voice, flat affect, restricted mood, impaired attention and concentration, impaired recent and remote memory skills, and only fair insight and judgement. (Pl.'s Br. at 22). However, Dr. Shah's contemporaneous reports conflict with this opinion. On several occasions, Dr. Shah found that plaintiff was either "well-dressed," "well-groomed," or "dressed appropriately," and her speech was of "normal rate and volume." (*See e.g.* T. 923, 925, 926, 927). As stated above, Dr. Shah also consistently found that plaintiff's attention span and concentration were "good," and her memory was "good." (*See e.g.* T. 915, 919 921, 926, 929, 930). The ALJ was presented with conflicting evidence, which was for him to resolve. *Smith v. Berryhill*, __ F. App'x __, No. 17-2005-CV, 2018 WL 3202766, at *4 (2d Cir. June 29, 2018) (court defers to the Commissioner's resolution of conflicting evidence). While plaintiff's mood was occasionally "depressed," the ALJ found that depressive disorder was one of plaintiff's severe impairments. (T. 27). Thus, the ALJ's decision not to add limitations to plaintiff's RFC, relating to stress, relationships with others, or maintaining a regular schedule is supported by substantial evidence.

Plaintiff argues that "[f]or all practical purposes, the ALJ relied on non-examining psychologist S. Juriga to determine plaintiff's mental RFC. (Pl.'s Br. at 23-24). Plaintiff further argues that Dr. Juriga did not examine plaintiff and did not explain the opinions. Plaintiff also argues that Dr. Juriga's opinions are not supported by the evidence of record, and the doctor does not cite any medical evidence in support of those opinions. (*Id.*)

The court would first point out that the ALJ may rely upon the opinion both examining and non-examining state agency medical consultants because these individuals are qualified experts in the field of social security disability. *See Frey ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."); *Little v. Colvin*, 14-CV-0063 (MAD), 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") (internal quotation marks omitted).

Dr. Juriga's report is based on the evidence of record up to the time of his report. Dr. Juriga considered the treating sources' opinions in addition to the consultative opinions of both Dr. Rita Figueroa, M.D. (physical) and Dr. Moore's (mental). (T. 128-29). The conclusion, which Dr. Juriga stated was based on the "totality of the evidence," was that plaintiff was capable of performing simple work with "low contact w/the general public." (T. 131). Thus, Dr. Juriga explained the mental RFC, cited to

the medical evidence, and given this court's discussion above, Dr. Juriga's RFC is consistent with the other medical evidence of record, including the reports that Dr. Shah wrote after Dr. Juriga wrote his report.

## 2. Physical RFC

Plaintiff cites the opinion of Dr. Jeffrey Gray, M.D., plaintiff's primary care provider, who opined in a December 23, 2014 "Questionnaire," that plaintiff had issues with mood, secondary to pain, and she would be off task more than 33% of the workday and absent more than four days per month. (Pl.'s Br. at 10 - T. 814-15). In the same questionnaire, he found that plaintiff could only sit, stand and or walk for two hours in an eight-hour day, and that she would have to change positions every 15 minutes. (T. 815). The ALJ afforded Dr. Gray's opinion "no more than little weight" because it was inconsistent with contemporaneous treatment notes in which plaintiff occasionally stated that her pain was 0/10, even though other reports, plaintiff alleged that her pain level was 6/10, 8/10, or higher. (T. 35). The ALJ found that there was no corroborating evidence for the extent of Dr. Gray's stated physical limitations. (*Id.*)

Dr. Gray's limitations on sitting, standing, and walking were also inconsistent with Dr. Thomas Oven, M.D., another treating physician, who completed a medical report on April 17, 2014 in which he stated that plaintiff could sit for 8 hours in an 8-hour workday and could lift over ten pounds up to 3 hours per day. (T. 721). On February 17, 2014, Dr. Oven examined plaintiff and found that her hands, wrists, elbows, and shoulders moved normally, free of pain, and although there was some tenderness in her right calf, there was no tenderness in the left calf, and her gait was

26

normal. (T. 652). On November 4, 2013, even though plaintiff complained of pain, and there was some tenderness in the lower left extremity, her gait was normal. (T. 653). Although in the same report, Dr. Oven opined that plaintiff would be "off task" greater than 20% but less than 33% and that she would be absent three days per month, there is no explanation for these extreme limitations, given the doctor's finding regarding plaintiff's physical abilities. In addition, although Dr. Oven stated that plaintiff's medications could "potentially" cause side effects, he stated that "patient reports tolerating the medication fine." (T. 721).

Plaintiff had a consultative physical examination on June 20, 2014 by Dr. Figueroa. (T. 750-54). After conducting the examination, Dr. Figueroa found that plaintiff had full range of motion in her spine, shoulders, elbows, arms, forearms and wrists. (T. 753). She also had full range of motion in her hips, knees, and ankles, with stable, nontender joints, with no redness, heat or swelling. Although her deep tendon reflexes were decreased in all extremities, and she was unable to sense some pinprick in the lower left quadrant, her strength was 5/5 in both upper and lower extremities. (*Id.*) Dr. Figueroa stated that "[t]he claimant does not have any limitation based on today's evaluation." (T. 754). At her hearing, plaintiff explained that, on the day that she was examined by Dr. Figueroa, plaintiff was having one of her "good days" and, in fact, it was the best day that she ever had. The court notes that the ALJ did include significant restrictions on plaintiff's physical abilities in his RFC, thus, he did not adopt Dr. Figueroa's opinion regarding the plaintiff's physical limitations, based on her RSD and her foot issues. Thus, the ALJ took into account that plaintiff might have been having a

"good day" when she saw Dr. Figueroa.[10]

Podiatrist Shari Nichols, DPM also completed a check-box questionnaire in which she stated that she was treating plaintiff for bunion deformity, for which she performed more than one surgery, left RSD, which Dr. Nichols states she did not diagnose, and hammer toes. (T. 1058). Dr. Nichols opined that the above conditions would cause plaintiff pain and fatigue. (*Id.*) She also opined that the condition itself, together with the pain and "side effects" from medication would ***not*** diminish concentration, but would diminish work pace. Plaintiff would need to rest at work, she would be "off-task" more than 15%, but less than 20% during the day, and she would be absent two days per month. (T. 1059).

Notwithstanding the above, Dr. Nichols also stated that plaintiff could stand and walk 6 hours out of an 8-hour day, but that she would need to elevate her feet 10% of the day. (T. 1059). The questionnaire does not ask about plaintiff's ability to sit, so the doctor only opined that plaintiff could stand/walk for six hours, but had to elevate her legs for 48 minutes (10% of 8 hours). The ALJ found that plaintiff was limited to sedentary work. Standing and walking for six hours would put much more of a strain

---

[10] The court notes that on April 16, 2015, plaintiff told Physician Assistant ("PA"), Aspen D'Angelo that "for the most part ***over the past 14 months, her RSD has remained stable and "manageable."*** (T. 820) (emphasis added). She went to see PA D'Angelo because after her February 2015 foot surgery, she was experiencing increased pain and wondered if there was something "'new, stronger, more magical' to help with her RSD." (*Id.*) She admitted to being depressed and under a lot of stress. (*Id.*) PA D'Angelo stated that plaintiff's health was otherwise "stable," and had no further rheumatologic symptoms. (*Id.*) On physical examination, PA D'Angelo noted that, although there was some "trace edema" in the lower extremities and in the post-surgical toe, there was no other swelling. (T. 821). In addition, although plaintiff complained of exquisite tenderness to the touch in both lower extremities, she had good mobility, could get on and off the table without assistance, and "at one point during the visit she [was] noted to hop off the examination table without using a step." (T. 821). Plaintiff ambulated normally.

on plaintiff's feet, so it is unclear whether Dr. Nichols would have had the same opinion regarding elevation of plaintiff's legs if the question had included a sitting limitation.  In addition, Dr. Nichols noted that she had not prescribed any medication for plaintiff's foot condition.  In any event, as the ALJ pointed out (T. 34-35), there are no contemporaneous medical reports from Dr. Nichols that are dated prior to the expiration of plaintiff's insurance coverage which would support Dr. Nichols's check-box questionnaire.[11]

Thus, plaintiff's argument in this case relies most heavily on the check-box questionnaires completed by plaintiff's treating physicians.  The case is very similar to *Smith v. Berryhill*, *supra* in which the plaintiff argued that "no physician contradicts the opinions of Smith's three treating physicians as to his ability to stay on task and maintain regular attendance." __ F. App'x __, 2018 WL 2018 WL 3202766, at *4.  In *Smith*, the court held that even though the ALJ did not explicitly follow the treating physician rule, the record, and the ALJ's opinion made it clear that the ALJ applied the substance of the rule, and the plaintiff received its advantages. *Id.*  The court upheld the ALJ's finding that aspects of the treating physicians' opinions were "critically flawed," and they were inconsistent with other substantial evidence of record. *Id.* (citations omitted).

In this case, as in *Smith*, the ALJ found that the treating physicians' check-box questionnaires regarding plaintiff's ability to stay on-task and her alleged inability to maintain attention and concentration or maintain a schedule were not supported by the

---

[11] There is a report from Dr. Nichols, dated July 13, 2015, in which she discusses the surgery on plaintiff's right toe. (T. 842).

physicians' own contemporaneous notes.  As discussed above, this court agrees that the ALJ's decision was supported by substantial evidence.  Although plaintiff faults the ALJ for making a determination that plaintiff would be off-task for 3-5% during the day because no doctor made that specific assessment, the ALJ was simply taking into account limitations that would be consistent with the doctors' contemporaneous notes. (T. 36).  The ALJ specifically discussed why he was rejecting the excessive percentages that were listed in the various questionnaires. (*Id.*)  In addition, the ALJ stated that he specifically considered the symptoms associated with plaintiff's knees and feet. (T. 34-35).

The ALJ did not question that plaintiff was in pain or that she had limitations. He found that the stated limitations were not as extensive as she alleged or as the check-box questionnaires implied.  Plaintiff argues that the ALJ failed to understand the relationship between plaintiff's pain and her mental impairment, arguing that plaintiff's pain made her depression worse, and her depression made her pain worse. (Pl.'s Br. at 15-17).  This court does not agree.  The ALJ considered plaintiff's functional limitations from both physical and mental impairments.  The issue was not the diagnosis itself, but the functional limitations caused by the plaintiff's impairments in combination, whether those limitations were physical, mental, or both.  The ALJ relied upon the contemporaneous reports of the plaintiff's physicians in determining that plaintiff's limitations were not as great as the doctors portrayed in their check-box forms.  The ALJ did give less weight to Dr. Shah's statement that plaintiff could not "work" because of a combination of her mental and physical impairments, and stated

that his specialty was psychiatry, so that commentary on the effects of the RSD on her functionality were beyond his expertise. (T. 33). The ALJ essentially said that the plaintiff's inability to "work" was a conclusion that was the province of the Commissioner, based on a consideration of the proper factors. (T. 33). The ALJ did not appear to be questioning the proposition that pain could affect depression and depression could affect pain.

The ALJ took the entire record into account, both physical and mental limitations when determining plaintiff's RFC. Because the ALJ's RFC determination was supported by substantial evidence, the hypothetical question to the VE, tracking the RFC determination, was appropriate. *See, e.g., Calabrese v. Astrue*, 358 F. App'x 274, 276-77 (2d Cir. 2009) (where the hypothetical question to the VE is based on an RFC analysis supported by substantial facts, the hypothetical is proper). Thus, the determination that plaintiff was not disabled is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: September 25, 2018

_____
**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**